**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: March 31 2017

John P. Gustafson
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 09-36676 |
| | ) | |
| Mary M. James, | ) | Chapter 7 |
| | ) | |
|     Debtor. | ) | Adv. Pro. No. 15-03035 |
| | ) | |
| Mary M. James, | ) | Judge John P. Gustafson |
| | ) | |
|     Plaintiff, | ) | |
|       v. | ) | |
| | ) | |
| ACS, et al. | ) | |
| | ) | |
|     Defendant(s). | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff Mary M. James' Complaint [Doc. # 1] against Defendants Educational Credit Management Corporation ("ECMC"), the United States Department of Education ("ED"), Fifth Third Bank of Northwest Ohio N.A. ("Fifth Third"), the Office of the United States Attorney ("AUSA"), and Sallie Mae Servicing, seeking a determination of the dischargeability of her student loans. Pursuant to a Stipulation between Plaintiff and Navient Solutions, Inc. ("Navient"), Sallie Mae Servicing was dismissed as a defendant in these proceedings. [Doc. # 7].

The District Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the District Court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(i).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff's student loan debt cannot be discharged as an undue hardship.

## FINDINGS OF FACT

Plaintiff commenced this adversary proceeding in 2015, over five years after she had received her discharge and her Chapter 7 case had been closed. [Case No. 09-36676, Doc. ## 28-31].

Plaintiff is fifty-nine years old. She attended the University of Toledo in 1976, the University of South Florida in 1978, and she finished her undergraduate studies at the University of Toledo from 1993-1995, receiving a Bachelor's degree in Science. [Pl. Ex. 4, p. 7]. She attended the University of Toledo College of Law from 1996 to 1999, graduating from the College of Law with a Juris Doctorate. [*Id.*].

Her law degree, and her licensure as an attorney in the State of Ohio in May 1999, qualified her to work as an attorney in the state of Ohio. After completing law school, Plaintiff opened a firm "with a friend and then [her] father joined the firm. Things were going well and the future looked good." [Pl. Ex. 4, p. 11]. However, Plaintiff's father became ill and passed away. Her father's passing, combined with other factors, such as the downturn in the economy in the mid to late 2000's, caused Plaintiff to close the firm in 2007. After she closed the firm, Plaintiff took a job with Erie County, working as a Juvenile Defender for the County Public Defender's Office. At the time of the trial, she had worked for the County Public Defender's Office for approximately nine years,

2

Plaintiff testified that she currently has multiple medical conditions, which include restless leg syndrome, lupus, benign paroxysmal positional vertigo ("BPPV"), and emphysema. She stated that her BPPV can cause dizziness, extreme vertigo, nausea, and vomiting, and the symptoms could last for days or weeks. Her emphysema can cause difficulty in breathing, in addition to other health and digestive side effects. Plaintiff also testified that her lupus can cause her to become fatigued and feel weak. Other related doctors' visits and examinations were described in Plaintiff's Exhibit 3. [Pl. Ex. 3]. Plaintiff uses a cane for balance at times, and she stated that in 2015 she missed roughly six weeks of work, some of which was unpaid.

Plaintiff is currently divorced and without dependents, although at the time of trial she split household expenses with another individual. [Pl. Ex. 4, p. 5]. Plaintiff stated that she rented her housing from a friend who owns the property, and that her expenses exceeded her income. Because of her absences and illnesses, she testified that she was unaware as to how long she could be employed, either in her current position or in other employment in the area. She believed that jobs in the legal profession were scarce in her area, and because of her age and health, it would be difficult to obtain other employment.

Despite her health issues, Plaintiff is currently able to work thirty-six hours per week as a public defender. In 2010, Plaintiff had adjusted gross income of $38,539.00 [Def. Ex. H]; in 2011, $37,639.00 [*Id.*]; in 2012, $37,101.00 [*Id.*]; in 2013, $37,598.00 [*Id.*]; and in 2014, $37,617.00. [*Id.*].

Plaintiff's student loans were incurred during her pursuit of her undergraduate and law degrees. Five of Plaintiff's student loans are allegedly held by ECMC and are reinsured by the United States government. ECMC provides guarantor services to ED pursuant to the Federal Family Education Loan Program ("FFELP"), which includes title transfers of student loan accounts when the borrower has filed a bankruptcy petition. ECMC stated that it "defends student loan discharge proceedings it its capacity as a fiduciary to ED." [Doc. # 43, p. 3].

Of the five loans held by ECMC, three were taken out in February 1994, while two more were incurred in March of 1995. [Def. Ex. A]. The total loan disbursements amounted to $18,000.00. ECMC stated at trial that the amount they were owed had increased, and Plaintiff now had $49,248.21 in student loan debt with them, an amount consisting of the balance of the five loans, interest, and capitalized collection costs. [*Id.*]. On Schedule F of Plaintiff's petition, filed on September 27, 2009, Plaintiff listed ECMC as an unsecured creditor with a claim of $35,278.56.

Plaintiff explained in the "Date Claim was Incurred" section of Schedule F that the loans were from "1993-1995 – I believe that I paid off these debts – previously owed to bank and collected thru AFSA Data over 20 years ago." [Case No. 09-36676, Schedule F, p. 26]. At the trial, Plaintiff contested the amount owed to ECMC and testified that she paid the balances off. She stated that she believed that "years' worth of payments" were not credited to her balance.

ECMC contends that the loans defaulted in 2009, and at that point, the interest capitalized and collection costs "were added." [Doc. # 43, p. 3, n. 4]. The loans were rehabilitated in 2013, and because of the rehabilitation, the interest and collection costs were capitalized and added to the loan balances. ECMC asserted that the loan balance increased from the claim of $35,278.56 listed on Debtor/Plaintiff's petition, to the amount of $49,248.21 that ECMC argues it is now owed. [*Id.*].

In correspondence to Plaintiff from ECMC's Account Servicing Department, it states that ECMC's loans were repurchased by Sallie Mae in May 2005. When Plaintiff "failed to honor [her] repayment obligation . . . [her] account became severely delinquent and officially obtained a default status on January 15, 2009." [Pl. Ex. 2, p. 6]. ECMC was required to pay Sallie May a default claim, and Plaintiff's loans were transferred back to ECMC. [*Id.*].

Separately, ED has two loans that were made to Plaintiff. ED holds a Direct Consolidation Loan from itself to Plaintiff, which consists of two loans. One loan is subsidized "for approximately $33,071.78", and the second, "an unsubsidized loan for approximately $127,171.73." These amounts include interest as of April 16, 2015. [Doc. # 42, p. 2]. At the trial, Plaintiff did not contest that a total of $160,200.81 in student loan debt was due to ED.

According to testimony at the trial and ED's Account Record, Plaintiff is enrolled in the Income Based Repayment ("IBR") plan. [Def. ED's Ex. D]. An IBR plan is "a repayment plan with monthly payments that are limited to 15% . . . of your discretionary income, divided by 12." [Def. ED's Ex. G, p. 4]. Under the IBR plan, Plaintiff could pay ED a monthly amount of $191.85. [Def. ED's Ex. H, Doc. # 33-2, p. 1].

Further, Plaintiff, as an Erie County Public Defender, is eligible for the Public Service Loan Forgiveness Program. While in the program, Plaintiff is able to "apply for loan forgiveness after [making] 120 on-time qualifying payments." [Def. ED's Ex. I, Doc. # 33-3, p. 1]. As of December 2015, Plaintiff had made fifty-five qualifying payments on one of her two ED loans, and fifty-six qualifying payments on the other. If she were to continue making timely monthly payments,

Plaintiff would qualify to apply for loan forgiveness on both loans in 2021. [*Id.*, p. 2]. As of September 2015, Plaintiff had paid $5,050.29 on her two ED loans under this program. [Def. ED's Ex. H].

In her answers to ECMC's interrogatories, Plaintiff set forth her monthly expenses as follows: mortgage, $454.66; cell phone, $65.04; internet, $59.50; DirecTV, $57.46; Columbia Gas (monthly average), $102.27; Ohio Edison (monthly average), $157.37; garbage, $37.88; water and sewer, $28.12; food, $500.00; dry cleaning, $30.00; clothing, $60.00; hair styling, $75.00; medical and dental, $182.50; transportation, $200.00; recreation, $137.00; insurance, $120.00; pet care, $120.00; education student loan, $200.00; and finally, a car payment, $351.00.

At trial, Plaintiff testified that some of her monthly expenses had changed. Her expenses increased in the following categories: medical expenses by (roughly) $60.00, from $200.00 to $260.00; mortgage by $1.44, from $454.66 to $456.00; pet care by $60.00, from $120.00 to $180.00; hair styling by $20.00, from $75.00 to $95.00; clothing by $20.00, from $60.00 to $80.00; and transportation by about $100.00, from $200.00 to $300.00. The cost of DirecTV dropped to $25.00 per month, and Plaintiff testified that she would be receiving a 1% increase in her income, which would equate to an increase of approximately $26.00 per month and a net monthly income of $2,605.00

Phillipe Guillon ("Mr. Guillon"), a "Loan Analyst in the Litigation Support Team, Processing Group, Operation Services, Business Operations, Federal Student Aid, United States Department of Education" [Doc. # 33-1], testified at the trial. As a loan analyst for ED, Mr. Guillon provides litigation support for the United States Attorney Offices in bankruptcy court litigation involving student loans. Mr. Guillon testified that Plaintiff had two options she could pursue, with regards to paying the balance owed on her student loans.

Under Option One, Plaintiff could consolidate all loans owed to ECMC into a direct consolidation loan, which would be separate from Plaintiff's consolidated loans held by ED. This would allow Plaintiff the ability to apply for ED's Revised Pay As You Earn ("REPAYE") repayment plan for both ECMC and ED's loans. Mr. Guillon estimated that Plaintiff would owe roughly $127.00 per month on her ED loans and $39.00 per month on her ECMC loans, totaling a monthly payment of $166.00. Her enrollment in the REPAYE repayment plan would not affect her progress in making the one hundred twenty qualifying monthly payments toward her ED loans.

Under Option 2, Plaintiff would not consolidate her five ECMC loans, meaning that the ECMC loans would not qualify for the REPAYE repayment plan. They would, however, qualify for the IBR program. Her ED loans would still qualify for the REPAYE repayment plan. If Plaintiff's ECMC loans were placed into the IBR program and her ED loans were placed into the REPAYE repayment plan, Mr. Guillon estimated that Plaintiff would owe $58.00 per month for her ECMC loans and $166.00 per month for her ED loans, totaling a monthly payment of $224.00. As with Option 1, her enrollment in the Option 2 programs would not affect her progress in making the one hundred twenty qualifying monthly payments toward her ED loans.

## LAW AND ANALYSIS

Plaintiff seeks to discharge her student loan debt based upon the "undue hardship" exception to the nondischargeability of educational student loans under in 11 U.S.C. § 523(a)(8). Section 523(a)(8) provides for the dischargeability of a student loan obligation if "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents. . . ."

While the Bankruptcy Code leaves the term "undue hardship" undefined, the Sixth Circuit has adopted the test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) for determining the existence of "undue hardship." *See, Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005). Under the *Brunner* test, the debtor must prove each of the following three elements: (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [herself] and [her] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans. *Id.* at 385 (*quoting Brunner*, 831 F.2d at 396).

While the Sixth Circuit has previously authorized courts to grant a partial discharge of student loan debt pursuant to § 105(a), such equitable adjustment is appropriate only where the undue hardship requirement of § 523(a)(8) is met as to the part discharged. *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 622 (6th Cir. 2004). A debtor seeking an undue hardship discharge bears the burden of proof by a preponderance of the evidence. *Chime v. Suntech Student Loan (In re Chime),* 296 B.R. 439, 443 (Bankr. N.D. Ohio 2003).

**A. The First Prong of the *Brunner* Test**

The first prong of *Brunner* contemplates that a debtor is entitled to provide for her basic needs, such as food, clothing, shelter, medical care and transportation for herself and any dependents, before a debtor is to repay student loan debts. *In re Doremus*, 2014 WL 1168906, at *3, 2014 Bankr. LEXIS 1115, at *7 (Bankr. N.D. Ohio Mar. 21, 2014). When applying this test, a court is to therefore evaluate a debtor's household income and expenses, with a particular focus on what expenses are necessary to maintain a realistic basic standard of living. *Id.* After the evaluation, the court is to determine whether any income is leftover with which to pay said student loan debts. *Id.*

To prove the "minimal standard" *Brunner* prong, a plaintiff must show that he or she cannot, based upon their current income and expenses, maintain both a "minimal" standard of living and repay their student loans. *McKenzie v. Educ. Credit Mgmt. Corp. (In re McKenzie)*, 2012 Bankr. LEXIS 1344, at *7 (Bankr. D. Vt. Mar. 30, 2012). This "minimal standard of living" has been held to place a debtor's lifestyle - particularly expenses - under more rigid scrutiny than is utilized under Section 707(b) or 1325. *See*, *In re Miller*, 409 B.R. 299, 319-320 (Bankr. E.D. Pa. 2009), *quoting*, *In re Savage*, 311 B.R. 835, 840 n.7 (1st Cir. BAP 2004).

A minimal standard of living includes expenses "for basic necessities such as food, shelter, clothing and medical treatment . . . ." And while a debtor need not live in abject poverty to satisfy the first *Brunner* prong, a debtor must make a significant effort to "live within the strictures of a frugal budget for the foreseeable future." *Larson v. United States (In re Larson)*, 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010). Also, a debtor is expected to maximize income and minimize expenses. *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 438 (6th Cir. 1998); *Oyler*, 397 F.3d 382, 385. And, the fact that a debtor may be "financially burdened" is not enough to end the first prong's inquiry. *Hornsby*, 144 F.3d 433, 438.

In the case at hand, Plaintiff has experienced steady employment as an attorney since 2007, and for roughly nine years she has worked with generally no gaps in her employment, except for a period of time in 2015 during which she missed approximately six weeks of work. From 2010 to 2014, Plaintiff reported annual adjusted gross incomes of, respectively, $38,539.00 [Def. Ex. H], $37,639.00 [*Id.*], $37,101.00 [*Id.*], $37,598.00 [*Id.*], and $37,617.00. [*Id.*]. She has no legal dependents, so that portion of the first prong of the *Brunner* test relating to "dependents" is not applicable.

Plaintiff testified that her expenses established in her interrogatory answers [Pl. Ex. 4, p. 10] have increased slightly, as set forth above in the Statement of Facts. While her slightly increased expenses include necessary costs for housing and medical care, Plaintiff could make adjustments to her expenses that would allow her to pay her student loan obligations. "[A] court should examine the debtor's standard of living, with a view toward ascertaining whether the debtor has attempted to minimize . . . expenses." *Burton v. Educ. Credit Mgmt. Corp (In re Burton)*, 339 B.R. 856, 870 (Bankr. E.D. Va. 2006) (*quoting*, *U.S. Dep't of Health & Human Servs. v. Smitley (In re Smitley)*, 347 F.3d 109, 117 (4th Cir. 2003)).

Again, it should be noted that these requirements are based on the *Brunner* test's use of the term "minimal standard of living." Courts have held that this "minimal standard" does not mean "preexisting" (i.e., the lifestyle the debtor has been living) or "comfortable," but also does not mean "reduced to poverty." *Nixon v. Key Educ. Resources (In re Nixon)*, 453 B.R. 311, 327 (Bankr. S.D. Ohio 2011); *see also*, *Kelly v. Mich. Fin. Auth. (In re Kelly)*, 496 B.R. 230, 235 (Bankr. M.D. Fla. 2013)(a debtor "may not necessarily maintain her previous standard of living"); *McLeod v. AFSA Data Corp. (In re McLeod)*, 197 B.R. 624, 628 (Bankr. N.D. Ohio 1996)("The first prong of the *Brunner* analysis requires more than a showing of tight finances.").

Plaintiff currently spends $500.00/month on food [Def. ED's Ex. F, p. 10]. Defendant ED cites a November 2015 United States Department of Agriculture report that finds that a "thrifty monthly food plan for a single female aged 51 to 70 years is $163.60." This would create a differential of $336.40.

Taking into consideration Plaintiff's health issues, the court realizes that she may have higher food expenses than those established by the "thrifty monthly food plan" and could not maintain her health spending only $163.60 per month on food. However, slight reductions in food expenses to get closer to the amount set forth by the United States Department of Agriculture would allow Plaintiff to maintain a realistic basic standard of living, based on a "minimal" standard.

The court also agrees with ED's position that Plaintiff could reduce her transportation, clothing, and hair styling expenses. Plaintiff testified that her transportation expenses had increased by about $100 more than the $200 amount she included in her interrogatory response, and a portion of her expenses included car trips twice a month to visit grandchildren in Stowe and Toledo, Ohio. ED argues that Plaintiff could forego at least some of this trips, and the court was presented with no

8

evidence that the grandchildren were unable to visit Plaintiff at her residence, thereby allowing Plaintiff decrease her monthly expenses. With further slight adjustments to Plaintiff's monthly hair styling, which she testified cost $95 per month, and clothing costs, whish she testified cost $80.00 per month, substantial savings could be realized in Plaintiff's monthly expenses by reducing food, transportation, hair, and clothing expenses.

It also appears that Debtor could engage in further belt-tightening regarding "recreation" expenses. The court in *Nixon v. Key Educ. Res. (In re Nixon)*, 453 B.R. 311 (Bankr. S.D. Ohio 2011) identified food, shelter, basic utilities, personal hygiene products, transportation, health care, clothing, and "some small diversion or source of recreation" expenses as components of a minimal standard of living. *Id*. at 326-27 (*citing Wallace v. Educ. Credit Mgmt. Corp. (In re Wallace)*, 443 B.R. 781, 787-88 (Bankr. S.D. Ohio 2010) (*quoting*, *Ivory v. U.S. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).

The court will accept modest recreation expenses, but multiple recreation expenses, including the actual listed recreation expense of $137.00, Direct TV [$27.46], internet [$59.50], travel and a pet care expense of $180.00, indicates that Debtor expenses are above a "minimal standard of living". While Debtor's expenses do not indicate "an unreasonable standard of living", the minimal standard of living discussed in the *Nixon* and *Hornsby* decisions "is much more stringent than a standard of reasonableness." *In re Aaron*, 2016 WL 3483208, at *4, 2016 Bankr. LEXIS 2329, at *10 (Bankr. N.D. Ohio June 20, 2016); *and compare, In re Connor*, 526 B.R. 218, 226 (Bankr. E.D. Mich. 2015) ("cell phones, cable, internet and recreational expenses are not part of a minimal standard of living.")

In addition, there was testimony that Plaintiff's motor vehicle loan, an expense of $215.44 each month[1], was close to being paid off.

While saving several hundred dollars per month in expenses may appear insubstantial when compared to Plaintiff's outstanding student loan balance, the heightened standards for an undue hardship discharge in *Brunner* are difficult for a debtor to establish. The question under the first

---

[1]/ Plaintiff's interrogatories [Pl. Ex. 4] and petition [Case No. 09-36676, Doc. # 1, p. 32] reflected a monthly car payment of either $351.00 or $352.00. She testified at the trial that her current car payment was $215.44. According to her testimony, Plaintiff's expenses would be reduced by at least $215.44 when the vehicle is paid off.

9

*Brunner* prong is not whether Debtor's budget affords her the ability to repay the full amount of the loans, but rather, whether she could not maintain a minimal standard of living if forced to repay[2] the loans. Again, "although the minimal standard of living threshold does not require that a debtor live in abject poverty, it does envision that a debtor do some belt-tightening and forgo amenities to which...she may have become accustomed." *In re Grant*, 398 B.R. 205, 210 (Bankr. N.D. Ohio 2008); *see also, Lowe v. ECMC (In re Lowe)*, 321 B.R. 852, 857-58) (Bankr. N.D. Ohio 2004).

Finally, based upon the testimony at trial and post-trial Supplemental Declaration of Mr. Guillon [Doc. # 42-1], which the court finds to be credible and was not rebutted at trial, Plaintiff could enroll in the REPAYE repayment plan for both her ED and ECMC loans. If the court were to find that Plaintiff owed the entirety of what ECMC claims it is owed, that being a loan balance of $49,248.21, Plaintiff's enrollment in the Repaye Repayment Program would result in an estimated $127.00 monthly payment to ED and an estimated $39.00 monthly payment to ECMC. The estimated combined monthly payment of approximately $166.00 would be less than the $200.00 education student loan amount included in Plaintiff's interrogatory answer [Pl. Ex. 4, p. 10] and less than her testimonial statement regarding her monthly education student loan payment of $192.00.

And, if Plaintiff chose to not enroll in the REPAYE repayment plan for her ECMC loans as set forth in Mr. Guillon's "Option 1" [Doc. # 42-1, p. 2], she could enter the REPAYE repayment plan for her ED loans, and an income based repayment plan for her ECMC loans. This estimated combined total of $224.00 per month ($166.00 for her ED loans and $58.00 for her ECMC loans), being only $32.00 more than the amount she testified she currently paid per month, would fit into Plaintiff's monthly budget, while also affording Plaintiff the ability to provide for her basic needs.

Thus, the court concludes that Plaintiff has asserted expenses that exceed the "minimum" necessary expenses allowed by *Brunner*. Repayment of the loans, using existing government programs appears to be possible at this time under a "minimal standard of living" budget. *See, In re Connor*, 526 B.R. 218, 228 (Bankr. E.D. Mich. 2015), *aff'd sub nom. Connor v. United States Dep't of Educ. & Educ. Credit Mgmt. Corp.*, 2016 WL 1178264, 2016 U.S. Dist. LEXIS 40037

---

[2]/ "Repay" has been interpreted, by many courts, to be the amounts "required to service the student loan." *Douglas v. Educ. Credit Mgmt., Corp. (In re Douglas)*, 366 B.R. 241,255 (Bankr. M.D. Ga. 2007); *see also*, *Russotto v. Educ. Credit Mgmt. Corp. (In re Russotto)*, 370 B.R. 853, 858 (Bankr. S.D. Fla. 2007)(debtor could reduce expenses "and still have money to pay the small amount -- currently $ 39.38 per month -- needed to stay current on the student loan.").

(E.D. Mich. Mar. 28, 2016). In this case, because the Debtor is eligible for the public service loan forgiveness program, making these lower program payments could lead to the loans no longer being owed, if the conditions for forgiveness are met. As such, the Debtor has not established the minimal-standard-of-living prong of the *Brunner* test.

**B. The Second Prong of the *Brunner* Test**

Under the *Brunner* test's second prong, a debtor's financial adversity is required to be more than a temporary state of affairs. *Hatfield v. William D. Ford Federal Direct Consolidation Program (In re Hatfield)*, 257 B.R. 575, 582 (Bankr. D. Mont. 2000); *see also, Hornsby*, 144 F.3d at 437 ("Courts universally require more than temporary financial adversity. . ."). A debtor must show additional circumstances indicating that his or her distressed state of financial affairs is likely to persist for a significant portion of the repayment period. *Oyler*, 397 F.3d at 386. "Such circumstances must be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'" *Id.* (*citing, In re Roberson,* 999 F.2d 1132, 1136 (7th Cir. 1993)). These circumstances may include, among other things, illness or disability. *Id.* at 386. The second prong of the *Brunner* test gets to the core of the "undue hardship" standard in that it ensures that the financial hardship a debtor is experiencing is actually "undue", as opposed to garden-variety financial hardship that almost all debtors experience when they seek bankruptcy relief. *Morrow v. U.S. Dep't of Educ. (In re Morrow)*, 366 B.R. 774, 778 (Bankr. N.D. Ohio 2007).

Implicit in the requirement that a debtor's state of affairs is likely to persist for a significant portion of the repayment period is that the debtor's financial state be the result of events that are clearly out of the debtor's control. *Kirchhofer v. Direct Loans (In re Kirchhofer)*, 278 B.R. 162, 167 (Bankr. N.D. Ohio 2002). Thus, debtors must establish that they have taken all steps possible to improve their financial situation. *Id.* The purpose of this requirement is to give effect to the clear congressional intent – exhibited by the use of the word "undue" in § 523(a)(8) – that a student loan obligation requires more than ordinary hardship before it will be discharged. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088-89 (9th Cir. 2001).

When "additional circumstances" are premised on a debtor's health, the debtor must "precisely identify [her] problems and explain how [her] condition would impair [her] ability to work in the future." *Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005). In order to meet the debtor's burden of showing that her medical

15-03035-jpg    Doc 65    FILED 03/31/17    ENTERED 03/31/17 16:04:06    Page 11 of 17

condition impairs her ability to work now and in the future, expert medical testimony is not necessary. *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett),* 487 F.3d 353, 360 (6th Cir. 2007).

This is not the usual case where the Debtor is not working, and the court must determine whether that condition will persist. Instead, the Debtor here is employed as a professional, working full time, albeit in a position that provides lower compensation than other jobs in the legal profession. Moreover, the court has found that the Debtor has not met the first prong of the *Brunner* test. Thus there is no current inability to pay. Debtor cannot show that her "inability to repay" the loan will persist for a significant portion of the repayment period, because she has not shown a present inability to repay. *See*, *Douglas v. Educ. Credit Mgmt., Corp. (In re Douglas)*, 366 B.R. 241, 255 (Bankr. M.D. Ga. 2007)("The second prong of the *Brunner* test asks whether there are additional circumstances that exist suggesting that the debtor's state of affairs is likely to persist for a significant portion of the repayment period of the student loan. The state of affairs referred to in the second prong is the determination made in the first prong, *i.e.*, that the debtor cannot maintain, based upon current income and expenses, a minimal standard of living for herself and her dependents if required to repay her student loan.").

Instead, it appears that Plaintiff's argument must be that her present circumstances are going to change, and that there is something akin to a "certainty of hopelessness"[3] at some time in the future.[4] If this argument is to be considered, it appears that it must be viewed in the light of the

---

[3]/ The term "certainty of hopelessness" is used in three published Sixth Circuit student loan decisions: *Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 386 (6th Cir. 2005)("Applying the *Brunner* test, we conclude that Oyler fails its second prong, because he has shown no 'additional circumstances . . . indicating that this state of affairs is likely to persist for a significant portion of the repayment period.' Such circumstances must be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'")(*quoting, In re Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993)); *In re Tirch*, 409 F.3d 677, 681 (6th Cir. 2005)("The dischargeability of loans should be based upon 'a certainty of hopelessness, not merely a present inability to fulfill financial commitment.'"); *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 359 (6th Cir. 2007)("To satisfy the second prong, Barrett must show that circumstances indicate a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'").

[4]/ There is case law holding that if the first prong of the three-prong *Brunner* test has not been met, "analysis of the second and third prongs is unnecessary." *Gizzi v. Educ. Credit Mgmt. Corp.*, 364 B.R. 250, 254 (N.D.W.Va. 2007); *Pace v. Educ. Credit Mgmt. Corp. (In re Pace)*, 288 B.R. 788, 792 (Bankr. S.D. Ohio 2003)("It has been held that the first factor detailed above constitutes a threshold that if not met, precludes an analysis of the remaining factors."); *In re Buchanan*, 276 B.R. 744, 751 (D. N.D. W.Va. 2002). However, other courts have allowed the possibility of future changes in circumstances to be considered, even when the first prong of *Brunner* is not met. *See*, *Russotto v. Educ. Credit Mgmt. Corp. (In re Russotto)*, 370 B.R. 853, 858 (Bankr. S.D. Fla. 2007)("However, as noted in the analysis of the first prong of the *Brunner* test, the Court found that the Debtor could remain current on the loan even under in her

15-03035-jpg    Doc 65    FILED 03/31/17    ENTERED 03/31/17 16:04:06    Page 12 of 17

availability of certain government programs that could benefit Plaintiff. *See e.g.*, *Educ. Credit Mgmt Corp. v. Stanley,* 300 B.R. 813, 818 (N.D. Fla. 2003).

In addition to being eligible for government programs that would result in reduced monthly payments, based on Plaintiff's position as an Erie County Public Defender, she is also eligible to apply for loan forgiveness after making one hundred twenty "on-time qualifying payments" under the Public Service Loan Forgiveness Program. [Def. ED's Ex i]. Plaintiff has made fifty-five qualifying payments on one of her ED loans and fifty-six qualifying payments on the other ED loan. [*Id.*, p. 2]. If Plaintiff continues making her qualifying payments, she can apply for loan forgiveness in 2021. In less than five years, Plaintiff could receive a discharge of the $160,200.81 (plus interest) owed to ED.

Plaintiff has had steady employment working as a public defender in Erie County, and the court was not provided with any evidence that her employment status would be substantially certain to change in the near future. Plaintiff has worked as a public defender for nine years, and although Plaintiff testified that she missed six weeks of work in 2015, the court did not perceive a long history of absences during her time as a public defender.

Plaintiff's employment status could change, if her health were to deteriorate further. However, the Debtor did not submit evidence that this is medically certain to occur. Plaintiff testified that she currently suffers from several different medical conditions - particularly, BPPV (vertigo), emphysema, and lupus. Along with Plaintiff's testimony, Plaintiff provided the court with thirty pages of documents and medical records regarding her different medical conditions. [Pl. Ex. 3]. Plaintiff provided the court with evidence and testimony that substantiated the existence of her medical conditions. These conditions may very well prevent her from working at some point in the future. But that is not certain, or substantially certain, to occur during the repayment period.

---

family's current financial state. It therefore follows logically that where there is no current inability to pay, and no reasonable prospect of a change in circumstances, no inability to pay can be presumed to continue into the future. Since the second prong of *Brunner* assumes that the debtor is currently unable to remain current on the student loan, the second prong of *Brunner* can never be satisfied where (a) the debtor is currently able to pay *and (b) no diminishment of income can be reasonably anticipated.*")(emphasis added). It is possible that the difference between these two approaches is more technical than real, as the first prong of the *Brunner* test speaks in terms of a debtors ability to "maintain" a minimal standard of living while repaying student loans. The term "maintain" would appear to have a forward-looking element to it. In any event, the court will examine Debtor's evidence under the second prong of the *Brunner* test.

15-03035-jpg    Doc 65    FILED 03/31/17    ENTERED 03/31/17 16:04:06    Page 13 of 17

The court does not want to minimize the seriousness of the Plaintiff's medical conditions. There is certainly hardship in her life. However, at the time of trial, Debtor's medical conditions did not prevent her from working. And arguing that medical conditions indicate a "certainty of hopelessness" must "precisely identify her problems and explain how her condition would impair her ability to work in the future." *See Tirch,* 409 F.3d at 681. Moreover, unlike debtors with a long history of not working, a debtor with a long history of relatively uninterrupted employment will have a difficult time demonstrating the required certainty that there will be an imminent change in circumstances. "One of the best indicators, when attempting to predict a debtor's future financial situation, comes from events that have occurred in the past." *Wolph v. United States Dep't of Educ. (In re Wolph)*, 479 B.R. 725, 730 (Bankr. N.D. Ohio 2012). In short, the evidence of her nine years of continuous employment at the same job was not rebutted by the medical evidence.

Thus, Plaintiff has failed to demonstrate that she is experiencing "the certainty of hopelessness" set forth in the *Oyler*, *Tirch* and *Barrett* decisions, and this court cannot conclude, on the record before it, that Plaintiff has met her burden under the second prong of *Brunner*. Plaintiff currently has steady employment and a salary just below $40,000 per year. Under the Income Based Repayment (IBR) plan, and/or the REPAYE repayment plan, Debtor appears to be eligible for reduced monthly loan payments that would fit within a "minimal standard of living" budget based on her income and expenses. These reduced monthly payments, in combination with her eligibility to apply for debt forgiveness under the Public Service Loan Forgiveness Program, prevent a finding of "undue" hardship. Plaintiff has failed to show, at this time, that her medical conditions are substantially certain to stop her from working prior to a time when some, or all, of her educational debts may be resolved.[5]

Because the first two prongs of the *Brunner* test have not been met, the court does not need to review the third element of the *Brunner* test.

---

[5]/ While lacking the degree of certainty required for a finding of "undue" hardship, the court acknowledges that it is certainly possible that one or more of Plaintiff's health issues may force her to discontinue her present employment and drastically alter her economic circumstances. If that were to occur, and efforts to obtain relief from her student loan debt through administrative processes were unavailing, Plaintiff may have to file for bankruptcy again, and seek to discharge these educational loans in a new proceeding, based on her then-current circumstances. Because this adversary complaint was not filed until five and a half years after the underlying Chapter 7, the Debtor-Plaintiff would be eligible to seek Chapter 7 relief relatively quickly, if there were a substantial change in her circumstances.

15-03035-jpg    Doc 65    FILED 03/31/17    ENTERED 03/31/17 16:04:06    Page 14 of 17

**C. Plaintiff's Claim of Payment**

Plaintiff has asserted that some or all of her loans to ECMC were satisfied by payment. At Trial, Plaintiff stated her belief that she paid off the loan balances owed to ECMC, and that ECMC had never demonstrated that it was owed money on student loans it made to Plaintiff. A review of the record before the court reflects the following.

Three loans were distributed to Plaintiff in February 1994, and two more were distributed in March of 1995. [Def. Ex. A]. The total loan disbursement amounted to $18,000.00. [*Id.*]. According to the Loan Detail, Loan History, and Loan Balance Statement, the "Current Lender" of the loans was "The Fauquier Bank", the "Current Servicer" was ACS Affiliated Comp Serv, the "Original Guarantor" was the Great Lakes Higher Education Corporation, and four of the five loans listed Fifth/Third Bank of Toledo as the "Original Lender", while the fifth loan listed Student Loan Funding as its "Original Lender." [*Id.*].

In 1998, Plaintiff and her then-spouse filed a Chapter 7 petition. [Case No. 98-31951]. Sallie Mae, then the servicer for the five loans, filed two claims against Plaintiff. The first claim was for $3,190.67 [*Id.*, Claim No. 1-1], and the second was for $22,483.29 [*Id.*, Claim No. 2-1], together totaling $25,673.96 in claims. There were no objections to the claims, and ECMC stated that the loans went into repayment status in June of 1999. On March 9, 2004, Plaintiff filed an adversary complaint that sought to discharge her student loans based on her 1998 bankruptcy. [Case No. 04-3075, Doc. # 1]. While the Complaint listed Sallie Mae as a defendant, ECMC, as the current holder of the student loan debt, was substituted in as a defendant in place of Sallie Mae. [*Id.,* Doc. # 8].

When answering ECMC's Interrogatory No. 17 in 2004, Plaintiff stated that the loans held by ECMC were "under economic deferment." [*Id.*, Doc. # 31-11, p. 7]. Plaintiff also answered, when asked about attempts made to repay ECMC's loan, that she had "[p]aid AFSA Data and [the] Toledo Perkins Loans in full." [*Id.*]. Before the case went to trial, it was dismissed by Plaintiff. [*Id.,* Doc. ## 33, 34].

Also in 2004, the Great Lakes Higher Education Guaranty Corporation assigned ECMC its "rights, title, and interest in those student loans . . . ." [Def. Ex. C]. ECMC's transfer manifest reflected the five loans, each shown with the original amounts that were disbursed in 1994 and 1995. [*Id.*]. ECMC contends that their five loans went into default in January 2009, and they were in "either repayment or forbearance" through 2013. At the time they rehabilitated in 2013, the interest

15

and capitalized collection costs were added to the alleged principal balance, resulting in ECMC's claim that it has a loan balance of $49,423.35.

Plaintiff contends that the records she produced, along with her testimony at trial, prove that she paid off the loans to ECMC, and that "years worth of payments" were not credited to her loan balances. The court believes Plaintiff's testimony that she made payments to ECMC in the past. However, the evidence and the record does not allow the court to determine that Plaintiff paid off any of the five ECMC loans in full. Plaintiff pointed to Exhibit 5A as proof that, at the very least, the $4,000.00 loan was paid off. But Exhibit 5A reflects that in February of 2002, a balance of $2,864.88 remained. [Pl. Ex. 5A, p. 2].

It appears more likely than not that while Plaintiff, in the past, made payments on the five loans now held by ECMC, the payments were never enough to pay off any of the loan balances. And while ECMC has not proven that it is owed $49,423.25 as it claims, it has provided the court with enough evidence to demonstrate that they are owed some amount of money by Debtor.

With the evidence and record before it, the court cannot determine with specificity what that amount actually is. While a bankruptcy court has both the power to find a debt nondischargeable and the jurisdiction to enter a money judgment for an amount to be excepted from discharge, it does not have to enter a judgment determining a specific amount.[6] *See, In re Leonard*, 644 F.App'x 612, 6-19620 (6th Cir. 2016)("[A] bankruptcy court may answer the nondischargeability question without deciding the value of the claim."); *In re Zimmerman*, 2017 WL 663196, at *5, 2017 Bankr. LEXIS 457, at **16-17 (Bankr. N.D. Ohio Feb. 16, 2017); *and see generally*, *Longo v. McLaren (In re McLaren)*, 3 F.3d 958 (6th Cir. 1993); 4 Collier on Bankruptcy, ¶523.32 at 532-141 (16th ed. 2013)("[T]he power to liquidate a nondischargeable debt and enter a money judgment is not mandatory. Thus, the bankruptcy court may exercise its discretion to limit the adjudication to a determination of nondischargeability and leave the liquidation of the liability and the entry of a money judgment to another court.")(footnote omitted).

---

[6]/ ECMC and ED both requested entry of judgment in their favor in general terms, but did not specifically request a "money judgment" or specify an amount being requested in their Answers. [Doc. ## 5, 6]. Moreover, ECMC and ED were Defendants in this action. Plaintiff's Complaint was only premised on the educational loans being an "undue hardship".

## CONCLUSION

Plaintiff having failed to meet the first two prongs of the *Brunner* test, the court cannot find that repayment of her existing student loan debt, or any part thereof, is an undue hardship at this time. Judgment will, therefore, be entered on the complaint in favor of Defendants ED and ECMC.

While the amount owed to ED is not disputed, it is not clear if ED is seeking to have its claim reduced to judgment, and what interest rate - the contract or judgment rate - ED would be seeking. If ED wishes the court to enter a judgment for $160,200.81 with interest running from April 16, 2015, ED can file a Motion for the entry of such a money judgment.

As previously discussed, the court lacks sufficient admissible evidence to determine the amount owed to ECMC. A bankruptcy court may enter final judgment on the amount of a nondischargeable claim, but it is not required to do so. Thus, the court will find the debt owed to ECMC nondischargeable, but it will not enter judgment of a specific amount, leaving that task, should it ever need to be performed, to another court.

A separate, final judgment on the Complaint in favor of Defendants ED and ECMC, in accordance with this Memorandum of Decision, shall be entered by the court within Ten (10) days if ED does not request the entry of judgment for $160,200.81, the amount owed as of April 16, 2015.